The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Dollar and the briefs and oral arguments on appeal to the Full Commission. The appealing party has shown good ground to reconsider the evidence in this matter. Having reconsidered the evidence of record, the Full Commission reverses the Deputy Commissioners denial of benefits and enters the following Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties in the I.C. Form 21, Agreement for Compensation, which was approved by the Commission on July 12, 1993, in the I.C. Form 26 Supplemental Agreement, approved on July 12, 1993, and in their Pre-Trial Agreement which was filed on March 4, 1998, which are incorporated herein by reference, and at the hearing as:
 STIPULATIONS
1. The Industrial Commission has jurisdiction over the subject matter of this case, the parties are properly before the Commission, and the parties were subject to and bound by the provisions of the North Carolina Workers Compensation Act at all relevant times.
2. General Accident Insurance Company was the carrier on the risk.
3. An employee-employer relationship existed between the parties at all relevant times.
4. On February 19, 1993, the plaintiff sustained an admittedly compensable injury on, as a result of which the parties entered into the Form 21 Agreement.
5. The plaintiffs average weekly wage was sufficient to generate the maximum compensation rate of $442.00 per week.
6. The plaintiff received temporary total disability benefits from April 3, 1993 through July 2, 1993 (pursuant to a Form 26 filed with and approved by the Industrial Commission).
7. On August 6, 1993, a Special Deputy Commission approved a Form 24 Application for Termination of Benefits.
8. The issues for determination are:
 a. Whether the plaintiff is entitled to any additional benefits as a result of his admittedly compensable injury.
 b. Whether the plaintiff is entitled to an assessment of attorneys fees for unreasonable defense of this claim pursuant to N.C. Gen. Stat. 97-88.1.
9. The parties stipulated sixty-eight pages of medical reports into the record.
 ***********
Based upon all of the competent evidence adduced from the record, and the reasonable inferences therefrom, the Full Commission makes the following additional:
 FINDINGS OF FACT
1. In 1990, the plaintiff underwent a diskectomy for a ruptured disk which was unrelated to this claim. The plaintiff was rated by neurosurgeon Dr. Jones of Greenville, North Carolina, as retaining a fifteen percent permanent partial impairment to his back as a result of this injury and surgery.
2. The plaintiff lived in Kannapolis, North Carolina, at the time of the injury giving rise to this claim.
3. As of February 19, 1993, plaintiff had been employed by defendant-employer, a retail shoe store, for over five years and was working as a district manager. As a district manager he was responsible for oversight of approximately twenty stores along the Interstate 85 corridor from Greensboro to Concord, North Carolina. Plaintiffs duties included visiting two to three stores per day to review their paperwork, check loss prevention, stock, unload and display shipments of shoes. He also checked pricing of shoes to make sure that pairs were properly priced, that shoe boxes had the proper shoes in them and that the appropriate inventory was stacked above the displays.
4. Depending on staffing levels, plaintiff might have to manage a store himself, spending as long as thirteen or fourteen hours in a store without being relieved. The entire stock was changed quarterly based on the seasons and changing styles. This entailed moving 15,000 pairs of shoes per store at levels ranging from the floor to six or eight feet high. He also participated in the unloading and unpacking of the 50 to 100 cases of shoes that came in to each store every week.
5. Approximately 50% of the time in each store was dedicated to bending, lifting and climbing, the other time spent doing paperwork. One morning per week was his "office day, when he remained in one place doing paperwork and telephone calls. The other days he had to drive three to four hours each day to get to the stores that were in his district.
6. After the Christmas rush in 1992, plaintiff took on additional responsibilities, including more driving and more physical work, as the district to which he had just been transferred to "clean up was losing money and employee turnover was very heavy. This caused a need to train more employees and perform more of the physical work himself.
7. Plaintiffs average weekly wage at the time of the injury was $1,002.87.
8. On February 19, 1993, plaintiff fell from a stool while stocking shoes, resulting in a compensable injury to his lumbar spine. He was taken to the hospital by ambulance. As a result of that compensable injury, plaintiff was restricted from bending, lifting, stooping and driving. He was placed on a company "leave of absence, as evidenced by forms he filled out and submitted for that purpose.
9. Pic N Pays Form LOA (Leave of Absence) #6 submitted by plaintiff indicated his willingness to return to work as of March 15, 1993 "should a position for which I am qualified become available. LOA Form #5, submitted at the same time as #6, was entitled "Release from Medical or Workers Comp Leave of Absence. Although the general policy of the employer was that a return to work was approved only when the employee was cleared for full duty, plaintiff had been allowed to return to a light duty desk job after his previous back injury and surgery in 1990 and so he anticipated that he would be offered light duty this time, as well.
10. Anticipating the submission of Leave of Absence forms 5 and 6, the employer expected to terminate plaintiffs leave of absence and his employment. The exhibits indicate that the employer took steps to do this even prior to a meeting with plaintiff on March 12, 1993.
11. On 12 March 1993, plaintiff was summoned to a meeting with his direct supervisor, David Brouwer-Ancher, and a supervisor of Mr. Brouwer-Ancher, Richard Garner. Plaintiff had been asked to bring his release from the physician. On that date, it was Mr. Garners mistaken impression that a full doctors release had been submitted by the plaintiff to the benefits department. When he arrived, after a period of waiting, plaintiff was called in to Mr. Garners office, with Mr. Brouwer-Ancher in attendance. Mr. Garner presented plaintiff with a request to sign a document entitled "Statement of General Release and Separation. This document was a resignation contract outlining payments to be made upon plaintiff s resignation from employment and included a release of all claims against Pic N Pay, including "any and all claims under the laws of North Carolina . . . including those arising . . . based on any statute or regulation. No exception was made for workers compensation claims. Plaintiff refused to sign the document.
12. At the time of the March 12, 1993 meeting, plaintiff was still under doctors restrictions from driving more than one hour per day, which would have prevented him from performing his duties as a district manager. Despite plaintiffs refusal to sign the resignation contract on March 12, 1993, his employment was terminated. Company documents indicate that his leave of absence had expired, with plaintiff still unable to return to work.
13. Plaintiff was initially treated at the emergency room, but Dr. James G. Hendrix assumed his care beginning February 23 and treated him with medication and rest for an acute lumbosacral strain. Plaintiff remained out of work and under the doctors care until May 18, 1993 when he began working for another company, Shoe Show, in a similar capacity but at a lower wage. Dr. Hendrix continued to limit his driving to two hours per day at the office visit of June 4, 1993, and his new employer accommodated the restriction. At the final examination of July 2, 1993, plaintiff reported occasional back pain and spasm. Dr. Hendrix released him from care, indicating that he would continue to have flare-ups. He continued to work for Shoe Show after that date.
14. As his new salary with Shoe Show was $40,000.00 per year, or $769.23 per week, defendant-carrier ceased paying him temporary total disability payments and began paying him temporary partial disability payments of $82.82 per week, pursuant to a Form 26. This was based on a mistaken average weekly wage of $893.46, which has since been stipulated to be $1,002.87.
15. As of July 6, 1993, plaintiffs treating physician released him to return to work to perform activities "as tolerated, at which point defendants unilaterally ceased payment of temporary partial disability compensation. On July 19, defendants filed a Form 24 with the Industrial Commission, which was approved administratively on August 6, 1993. At no point from the date of his employment with Shoe Show to the date of the hearing before Deputy Commissioner Dollar had plaintiff earned a weekly wage in excess of $769.23.
16. The granting of the Form 24 application was improper inasmuch as Section 97-18.1 of the General Statutes, the section of the Workers Compensation Act authorizing the Industrial Commissions Form 24 procedure, only applies to payment of "total disability being paid pursuant to G.S. 97-29. The Form 24 procedure does not apply to payments for partial incapacity being paid pursuant to G.S. 97-30. Termination of payments for partial incapacity can only be accomplished after a formal hearing before a Deputy Commissioner or Commissioner of the Industrial Commission.
17. At the hearing before the Deputy Commissioner and on appeal to the Full Commission, defendants claimed that plaintiff had by implication refused suitable employment since they claimed that plaintiffs firing was for insubordination. However, the Full Commission finds that the insubordination claim was merely a pretext and that the firing took place in order for the defendants to avoid their responsibilities under the Workers Compensation Act. Additionally, there was no evidence to the effect that other employees had been or would have been fired for the offenses the defendant employer claimed had been committed by plaintiff. There was no company documentation indicating a termination for insubordination until a new "Personnel Change Form was created to state "Discharged-Insubordination, April 3, 1993, which was after the fact of plaintiffs termination and after the date of a company document indicating a termination due to the exhaustion of the Leave of Absence and, tellingly, after plaintiffs refusal to sign a severance agreement.
18. David Brouer-Ancher was plaintiffs supervisor, and the two men had a poor working relationship which had been documented in plaintiffs personnel file. However, the alleged acts of insubordination had taken place before the compensable injury yet the defendant employer waited until after the compensable injury to effect the pretextural firing.
19. Defendants paid compensation to plaintiff for temporary total disability from April 3, 1993 through May 17, 1993. Defendants paid compensation to plaintiff for temporary partial disability at the rate of $82.82 per week through July 6, 1993. However, this compensation was based upon an incorrect average weekly wage of $893.46.
20. Plaintiff remained disabled from performing the Pic N Pay job after 6 July 1993. Plaintiff can maintain his disabled status if he can show that his physical condition would prevent him from performing the job. Seagraves v. Austin Co. of Greensboro,123 N.C. App. 228, 472 S.E.2d 587 (1996). Plaintiff has presented such evidence by way of Dr. Anthony H. Wheelers deposition. In that deposition, Dr. Wheeler, a board certified neurologist and pain medicine specialist, responding to a hypothetical question framing the requirements of plaintiffs job with defendant-employer, stated that he would have restricted plaintiff from that job. Contrary to the assertions by defendants, Dr. Hendrix, the treating physician, never actually released plaintiff with "no restrictions. The last release available is in a letter to the insurance adjuster dated June 8, 1993. In that letter, Dr. Hendrix prospectively releases plaintiff from any driving restrictions "in four weeks. He cautions that plaintiff may have an occasional flare up "which might warrant occasional adjustment of his activities. He goes on further to suggest that future restrictions might best be addressed by the lumbar surgeon from the 1990 injury. These statements are not the equivalent of a release without restrictions. In fact, the explicit prediction is that further restrictions might be warranted.
21. In addition, Dr. Hendrix opined, and the Full Commission finds as fact, that, although the job with defendant-employer might not reinjure plaintiff, the job could likely cause him considerable pain and flare ups. As regular time out of work for flare ups would adversely impact plaintiffs job performance, plaintiff was effectively disabled from his Pic N Pay employment.
22. Defendants had reasonable grounds to defend this claim. Therefore, plaintiff is not entitled to attorney fees pursuant to N.C. Gen. Stat. 97-88.1.
 ***********
Based upon the foregoing findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. Plaintiff is entitled to additional compensation for temporary partial disability at the rate of $72.94 per week for six and four-sevenths weeks, for the period from May 18 through July 2, 1993, and to 2/3 the difference between his average weekly wage of $1,002.87 at the time of his injury and his actual earnings from July 2, 1993, until 300 weeks from the date of injury plus a 10% penalty for all payments not made within 14 days of their due date. N.C. Gen. Stat. 97-30, 97-31, 97-18.
2. As a Form 21 agreement had been entered into admitting plaintiffs disability, the presumption of disability continues until it is rebutted by defendants. Watkins v. Central MotorLines, 279 N.C. 132, 181 S.E.2d 588 (1971). Defendants admitted to plaintiffs continuing disability to earn the same wages when they entered into the Form 26 agreement to pay 97-30 wage loss. By entering into the Form 26 agreement, plaintiffs capacity to earn wages was only as is shown on that agreement. The remaining incapacity compared to his earnings at Pic N Pay are still subject to the presumption of disability.
3. Defendants may rebut the presumption of disability by showing that "plaintiff was terminated from his employment (1) for misconduct or fault unrelated to the compensable injury and (2) for which a non disabled employee would ordinarily have been terminated. Seagraves v. Austin Co. of Greensboro,123 N.C. App. 228, 472 S.E.2d 587 (1996). If both prongs are found, this is termed a "constructive refusal of suitable employment under N.C. Gen. Stat. 97-32.
Here, there is no evidence that plaintiff actually refused employment. In fact, when asked to resign, he refused to do so. And defendants theory of constructive refusal fails because of failure of proof under the second prong of the Seagraves test.
4. As defendants stopped paying without Industrial Commission approval, plaintiff is entitled to those benefits plus a 10% penalty for late payment. The statute allows for excuse from the 10% penalty only if "there is a showing by the employer that owing to conditions over which he had no control, such installment couldnot be paid within the period prescribed for payment (emphasis supplied). N.C. Gen. Stat. 97-18.
5. The only justification submitted by defendants during the Form 24 telephonic proceeding was that all work restrictions had been lifted. As has been reaffirmed in Stone v. CG Builders,346 N.C. 154, 484 S.E.2d 365 (1997) and Harrington v. Adams-RobinsonEnterprises, 128 N.C. App. 496, 500, 495 S.E.2d 377, 380 (1998), medical "and other evidence is required to rebut the presumption of disability. It is not enough to simply say that restrictions have been lifted. Seagraves, Stone and Harrington all indicate that continuing benefits should have been paid by defendants, but there has been no additional payment since July 2, 1993. As a consequence, plaintiff is entitled to a 10% penalty for all payments fourteen days past due. N.C. Gen. Stat. 97-18.
7. Plaintiff is entitled to have defendants to pay for medical expenses incurred as a result of the compensable injury as may be required to provide relief, effect a cure or lessen the period of disability. N.C. Gen. Stat. 97-2(19); 97-25.
8. Plaintiffs attorney is entitled to a reasonable attorney fee of 25% of the compensation paid to plaintiff.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Subject to the attorney fee set forth below, defendants shall pay to plaintiff additional compensation for temporary partial disability at the rate of $72.94 per week for six and four-sevenths weeks, for the period from May 18 through July 2, 1993, and to 2/3 the difference between his average weekly wage of $1,002.87 at the time of his injury and his actual earnings from July 2, 1993, until 300 weeks from the date of injury plus a 10% penalty for all payments not made within 14 days of their due date. Interest at the rate of 8% per year on the compensation due shall run from the date of the hearing before Deputy Commissioner Dollar until paid. Compensation and interest which has accrued shall be paid forthwith in a lump sum.
2. Defendants shall pay directly to plaintiffs attorney a reasonable attorney fee of 25% of the compensation and penalty ordered paid in Paragraph 1 of this Award. All of the interest shall be paid directly to plaintiff.
3. Defendants shall pay for all medical expenses incurred as a result of the compensable injury as may be required to provide relief, effect a cure or lessen the period of disability.
4. Defendants shall pay the costs.
This 24th day of April 2000.
 S/_____________ THOMAS J. BOLCH COMMISSIONER
CONCURRING:
S/___________________ BERNADINE S. BALLANCE COMMISSIONER
DISSENTING:
S/_______________ DIANNE C. SELLERS COMMISSIONER